No. ______

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Respondent*,

v.

THE STATE OF CALIFORNIA, *et al*.,
*Defendants-Petitioners*.

**On Appeal from the United States District Court for the Central District of California**
No. 2:25-cv-06230-MCS-CTS
The Honorable Mark C. Scarsi

## Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b)

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
SAMUEL P. SIEGEL
*Supervising Deputy Solicitor General*
ANYA M. BINSACCA
*Supervising Deputy Attorney General*

KRISTEN C.A. KIDO
KRISTIN A. LISKA
*Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: (619) 321-5878
Fax: (916) 732-7920
Kristin.Liska@doj.ca.gov
*Attorneys for State Defendants*

October 12, 2026

# TABLE OF CONTENTS

**Page**


Introduction ..... 1

Statement of the Question ..... 4

Statement of Facts ..... 4

- A. California's Laws Regulating Egg-Laying Hens ..... 4
- B. The Federal Egg Products Inspection Act of 1970 ..... 6
- C. Procedural History ..... 8

Reasons Why the Appeal Should Be Allowed ..... 10

I. Each of the Three Factors for Interlocutory Review Under 28 U.S.C. § 1292(b) Is Met Here ..... 11

- A. Whether the Federal Government Has Standing Is a Controlling Question of Law ..... 11
- B. Reasonable Jurists Can—and Do—Differ on Whether the Federal Government Has Standing to Bring Suits Like this One ..... 12
- C. Immediate Appeal Will Materially Advance the Termination of This Lawsuit ..... 20

II. This Case Presents a Significant Question Concerning the Scope of the Federal Government's Standing to Sue States ..... 20

Conclusion ..... 24

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*
458 U.S. 592 (1982)....................16

*American Free Enter. Chamber of Com. v. Engine Manufacturers Ass'n*
2025 WL 3124154 (N.D. Ill. Nov. 7, 2025)....................3

*Arizona v. Yellen*
34 F.4th 841 (9th Cir. 2022)....................16, 17, 18

*Cetacean Cmty. v. Bush*
386 F.3d 1169 (9th Cir. 2004)....................12

*Cramer v. Brown*
591 F. App'x 634 (9th Cir. 2014)....................5

*Cruise Lines Int'l Ass'n, Inc. v. Suganuma*
825 F. Supp. 3d 1170 (D. Haw. 2025)....................14

*D'Lil v. Best W. Encina Lodge & Suites*
538 F.3d 1031 (9th Cir. 2008)....................11

*Daimler Truck N. Am. LLC v. California Air Res. Bd.*
2025 WL 3049944 (E.D. Cal. Oct. 31, 2025)....................3, 14

*FDA v. All. for Hippocratic Med.*
602 U.S. 367 (2024)....................21, 22

*In re Cement Antitrust Litig.*
673 F.2d 1020 (9th Cir. 1982)....................12, 20

*KalshiEX LLC v. Johnson*
832 F. Supp. 3d 954 (D. Ariz. 2026)....................3, 13

*Missouri ex rel. Koster* v. *Harris*
847 F.3d 646 (9th Cir. 2017)....................6

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Missouri v. California*
586 U.S. 1065 (2019)....................6

*National Meat Ass'n v. Harris*
565 U.S. 452 (2012)....................22

*Nevada v. KalshiEX, LLC*
No. 26-1304 (9th Cir. May 21, 2026)....................14

*Reese v. BP Expl. (Alaska), Inc.*
643 F.3d 681 (9th Cir. 2011)....................*passim*

*Spokeo, Inc. v. Robins*
578 U.S. 330 (2016)....................11, 15

*Steel Co. v. Citizens for a Better Env't*
523 U.S. 83 (1998)....................17

*TransUnion LLC v. Ramirez*
594 U.S. 413 (2021)....................16, 21

*United States v. Alabama*
691 F.3d 1269 (11th Cir. 2012)....................16

*United States v. Alaska*
608 F. Supp. 3d 802 (D. Alaska 2022)....................14

*United States v. Arizona*
641 F.3d 339 (9th Cir. 2011)....................16, 17

*United States v. California*
921 F.3d 865 (9th Cir. 2019)....................16

*United States v. City of Boston*
833 F. Supp. 3d 30 (D. Mass. 2026)....................3

*United States v. Hawaii*
830 F. Supp. 3d 1028 (D. Haw. 2026)....................3, 14

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*United States v. King County*
122 F.4th 740 (9th Cir. 2024) ....................18, 19

*United States v. Mattson*
600 F.2d 1295 (9th Cir. 1979) ....................15

*United States v. Michigan*
817 F. Supp. 3d 630 (W.D. Mich. 2026) ....................3

*United States v. Michigan*
No. 26-cv-00246 (W.D. Mich. Oct. 7, 2026) ....................3, 14, 17, 20

*United States v. Minnesota*
2026 WL 2150211 (D. Minn. July 27, 2026) ....................3

*United States v. Nebraska*
835 F. Supp. 3d 962 (D. Neb. 2026) ....................3

*United States v. San Jacinto Tin Co.*
125 U.S. 273 (1888) ....................15

*United States v. Walz*
825 F. Supp. 3d 897 (D. Minn. 2026) ....................3

*United States v. Wisconsin*
No. 26-cv-749 (E.D. Wis. July 28, 2026) ....................3, 14

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*
529 U.S. 765 (2000) ....................16

*Washington v. KalshiEX LLC*
No. 26-3106 (9th Cir. May 21, 2026) ....................14

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. III ....................*passim*

# TABLE OF AUTHORITIES
**(continued)**

**Page**

## STATUTES

21 U.S.C.
§ 1032 ... 6
§ 1033(r) ... 7
§ 1034(a) ... 7
§ 1034(b) ... 7
§ 1034(c) ... 7
§ 1034(e) ... 7
§ 1035 ... 7
§ 1036 ... 7
§ 1036(a) ... 7
§ 1052(b) ... 7

28 U.S.C.
§ 1292(b) ... *passim*

Cal. Health & Safety Code
§ 25990(b)(3) ... 4
§ 25990(b)(4) ... 4
§ 25991(c) ... 5
§ 25991(e)(1) ... 5
§ 25991(e)(4) ... 5
§ 25991(e)(5) ... 5
§ 25996 ... 4

## REGULATIONS

Cal. Code Regs. tit. 3
§ 1320.4 ... 5

## OTHER AUTHORITIES

Brief of United States as *Amicus Curiae*, *Missouri v. California*, 586 U.S. 1065 (2019) ... 6, 8

# TABLE OF AUTHORITIES
**(continued)**

**Page**

*United States v. Michigan*, No. 26-cv-00246, First Amended Complaint [Dkt. No. 30] (April 27, 2026 W.D. Mich.)....................................19

*United States v. New Mexico*, No. 26-cv-01912, Opp'n to Mot. Dismiss (D.N.M. July 16, 2026) [Dkt. No. 27]..............................................3

## INTRODUCTION

The district court in this case decided a question on which there is substantial ground for difference of opinion: whether the federal government has standing to challenge an allegedly preempted state law merely by asserting a harm to amorphous "sovereign interests" or that a State enforcing its own laws necessarily harms the federal government's ability to uniformly enforce its laws. That question has arisen with increasing frequency in district courts across the country as the federal government has begun taking its policy disputes with States from the political arena and into federal court. Recognizing the importance of this question, and the fact that district courts need "clarity on abstruse sovereign standing issues on which reasonable jurists could disagree," Order Denying Second Motion to Dismiss, App. A-8, the district court *sua sponte* certified its order for interlocutory appeal under 28 U.S.C. § 1292(b). This Court should accept the district court's invitation to answer whether the federal government has standing to bring lawsuits like this predicated on an injury in law rather than an injury in fact.

For over a decade, California has prohibited the in-state sale of eggs that come from hens confined in a cruel manner. Last year, California's sales prohibition was challenged on the theory that it is preempted by the federal Egg Products Inspection Act. That suit was brought not by the egg producers and distributors regulated by the California law, but instead by the federal government.

California, along with intervening industry and animal welfare groups, argued that the federal government lacked standing to bring that challenge. In response, the federal government argued that it had standing because the mere existence of an allegedly preempted state law harmed its "sovereign interests." The district court initially rejected that argument. But following amendment, the district court reversed course and concluded that the federal government had sufficiently alleged that California's laws interfered with the operations or enforcement actions of a federal agency. It then certified its order for interlocutory appeal.

The requirements for certification under section 1292(b) are plainly met here. The question presented is a controlling one of law that would materially advance the outcome of this litigation by potentially ending it. *See Reese v. BP Expl. (Alaska), Inc.*, 643 F.3d 681, 687-688 (9th Cir. 2011) (listing the 1292(b) factors). There is also a substantial ground for difference of opinion on whether the federal government's novel "sovereign injury" theory is sufficient to support Article III standing. Indeed, district courts in this Circuit, and across the country, have reached different conclusions as to that question in various contexts. Over the past year and a half, the federal government has relied on this theory of standing to bring a wave of lawsuits seeking to preempt state laws the current federal administration disagrees with: challenges to egg sales bans in California

and Michigan[1]; environmental regulations in California[2]; in-state tuition laws in Minnesota and Nebraska[3]; gambling regulations in Arizona, Wisconsin, Minnesota, and New Mexico[4]; sanctuary city policies in Boston[5]; and state tort laws in Hawaii and Michigan.[6]

Some district courts have accepted this theory. Others have rejected it. Neither this Court, the Supreme Court, nor any other court of appeals has addressed it. And it is currently being litigated in several district courts in this Circuit. Answering the question presented here would thus materially advance the outcome not only of this case, but that of several others. And this question goes to the heart of why the Framers incorporated standing requirements into the

[1] *See United States v. Michigan*, No. 26-cv-00246, slip op. at 1 (W.D. Mich. Oct. 7, 2026).

[2] *See, e.g.*, *Daimler Truck N. Am. LLC v. California Air Res. Bd.*, 2025 WL 3049944, at *17 (E.D. Cal. Oct. 31, 2025); *American Free Enter. Chamber of Com. v. Engine Manufacturers Ass'n*, 2025 WL 3124154, at *7 (N.D. Ill. Nov. 7, 2025) (transferring case to E.D. Cal.).

[3] *See United States v. Walz*, 825 F. Supp. 3d 897, 903 n.3 (D. Minn. 2026), *appeal docketed*, No. 26-1886 (8th Cir. May 1, 2026); *United States v. Nebraska*, 835 F. Supp. 3d 962, 992 (D. Neb. 2026).

[4] *See KalshiEX LLC v. Johnson*, 832 F. Supp. 3d 954, 960 (D. Ariz. 2026); *United States v. Minnesota*, 2026 WL 2150211, at *8-*9 (D. Minn. July 27, 2026); *United States v. New Mexico*, No. 26-cv-01912, Opp'n to Mot. Dismiss at pp. 3-7 (D.N.M. July 16, 2026) [Dkt. No. 27]; *United States v. Wisconsin*, No. 26-cv-749, slip op. at 6-11 (E.D. Wis. July 28, 2026) [Dkt. No. 54].

[5] *See United States v. City of Boston*, 833 F. Supp. 3d 30, 45 (D. Mass. 2026).

[6] *See United States v. Hawaii*, 830 F. Supp. 3d 1028, 1034 (D. Haw. 2026); *United States v. Michigan*, 817 F. Supp. 3d 630, 650 (W.D. Mich. 2026).

Constitution: to keep federal courts out of generalized political disputes better left to the democratic process. This Court should grant the petition.

## STATEMENT OF THE QUESTION

California law prohibits the in-state sale of eggs that come from hens confined in a cruel manner. The federal government contends that this prohibition is preempted by federal law, and that the mere existence of an allegedly preempted state law inflicts a "sovereign injury." The district court held that such an injury is not sufficient to establish Article III standing, but that the federal government had standing because it alleged enough facts to support the inference that California's law interfered with a federal executive agency's operations or enforcement of the federal law.

The question presented is whether the federal government can establish injury in fact for Article III standing based solely on the allegation that a preempted state law harms its sovereignty, and if not, whether the federal government has made sufficient concrete allegations that the challenged law interferes with its operations or ability to enforce the federal law.

## STATEMENT OF FACTS

### A. California's Laws Regulating Egg-Laying Hens

California law prohibits the in-state sale of shell eggs and liquid eggs if the seller knows or should have known that the egg-laying hen was "confined in a cruel manner." Cal. Health & Safety Code §§ 25990(b)(3)-(4), 25996.

Confinement in a cruel manner is defined, as relevant here, as confinement of a hen in (1) a manner that "prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely," *id.* § 25991(e)(1); (2) an enclosure that lacks a specific minimum amount of usable floor space, *id.* § 25991(e)(4); or (3) any enclosure "other than a cage-free housing system," *id.* § 25991(e)(5). A cage-free housing system is a controlled environment in which hens "are free to roam unrestricted; are provided enrichments that allow them to exhibit natural behaviors . . .; and within which farm employees can provide care while standing within the hens' usable floorspace." *Id.* § 25991(c). As part of its implementation of this law, California requires a product's shipping documents to clearly indicate whether the eggs were produced in facilities that satisfy these standards. *See* 3 Cal. Code Regs. § 1320.4.

Since its adoption, California's ban on the sale of eggs that come from hens confined in a cruel manner has been subject to a series of suits brought by other government entities.[7] In 2014, a Missouri-led coalition of states sued alleging that California's law was preempted by the federal Egg Products Inspection Act (EPIA) and violated the Commerce Clause of the U.S. Constitution. That suit was

[7] While challenges have been brought to California's direct prohibition on confining hens in a cruel manner, *see, e.g.*, *Cramer v. Brown*, 591 F. App'x 634 (9th Cir. 2014), no industry group or regulated entity has challenged the sales ban at issue here.

dismissed on standing grounds. *See Missouri ex rel. Koster* v. *Harris*, 847 F.3d 646, 651-655 (9th Cir. 2017), *cert denied*, 581 U.S. 1006 (2017). Missouri and other States then sought leave to file an original action in the U.S. Supreme Court raising the same challenges. *See Missouri v. California,* 586 U.S. 1065 (2019) (No. 22O148). That request was likewise denied. *Id.* Of note here, the federal government under the first Trump Administration filed an amicus brief in *support* of California in that matter, arguing that California's law was "not preempted by" the EPIA. Brief of United States as *Amicus Curiae* at 7, *Missouri v. California*, 586 U.S. 1065 (2019).

**B. The Federal Egg Products Inspection Act of 1970**

While state law regulates animal welfare standards on farms, federal law regulates the food products themselves. As relevant here, Congress passed the EPIA in 1970 in order "to provide for the inspection of certain egg products, restrictions upon the disposition of certain qualities of eggs, and uniformity of standards for eggs, and otherwise regulate the processing and distribution of eggs and egg products . . . to prevent the movement or sale for human food, of eggs and egg products which are adulterated or misbranded or otherwise in violation of this chapter." 21 U.S.C. § 1032.

To achieve its purpose, federal law authorizes the Secretary of the U.S. Department of Agriculture to inspect facilities producing egg products and to

segregate—and if necessary, destroy—adulterated items. *See* 21 U.S.C. § 1034(a)-(c). Federal agencies are also tasked with ensuring that shell eggs are properly refrigerated and pasteurized, that facilities handling such eggs are sanitary, and that egg handlers are generally in compliance with federal law. *See id.* §§ 1034(e), 1035, 1036. In addition, federal law provides uniform standards for classifying and evaluating eggs with respect to quality, condition, weight, quantity, or grade, as well as labeling requirements for egg products. *See id.* §§ 1033(r), 1036(a).

The EPIA also includes an express preemption clause that specifically prohibits States and local jurisdictions from passing rules that (1) "require the use of standards of quality, condition, weight, quantity, or grade which are in addition to or different from the official Federal standards"; (2) "impose temperature requirements pertaining to eggs packaged for the ultimate consumer which are in addition to, or different from, Federal requirements"; or (3) "require labeling to show the State or other geographical area of production or origin . . . [or impose] [l]abeling, packaging, or ingredient requirements, in addition to or different than those made under this chapter . . . with respect to egg products processed at any official plant." 21 U.S.C. § 1052(b). Apart from these three specific contexts, federal law "shall not invalidate any law or other provisions of any State or other jurisdiction in the absence of a conflict with this chapter." *Id.* In the case discussed above where the federal government filed a brief in support of

California, the U.S. Solicitor General's Office explained that the EPIA does not preempt California's egg restrictions because California has not "impose[d] any additional or different assessment *standards of [the] kind*" imposed under the EPIA. Brief of United States as *Amicus Curiae* at 19, *Missouri v. California*, 586 U.S. 1065 (2019) (emphasis added).

### C. Procedural History

In 2025, the federal government switched positions and brought this suit against California and several of its officials, asserting that California's prohibition on the sale of eggs that come from hens confined in a cruel manner is expressly preempted by the EPIA. It sought a declaration that California's law is invalid and a permanent injunction against its enforcement. The Association of California Egg Farmers (an industry group) and several animal welfare organizations intervened in defense.

California and the intervenors argued that the federal government lacked standing. The district court originally agreed. Order Granting First Motion to Dismiss, App. B-2. The court rejected the federal government's argument that "the mere *existence* of a preempted state law creates a sovereign injury to the federal government." App. B-6 (emphasis in original). And the federal government "present[ed] no binding authority" for such a theory of standing. *Id.* The court further explained that if the federal government could bring suit seeking to preempt

a State's laws "[w]ithout requiring the United States to show some redressable injury, the federal government might initiate a campaign of preemption suits under the aegis of its sovereignty to bring state laws in line with its own political agenda." App. B-9. "The potential for abuse of the federal courts for political purposes is manifest." *Id.* The district court acknowledged that "California's *enforcement* of the subject laws and regulations could give rise to an injury in fact by impeding the operations or functions of the federal government." App. B-7 (emphasis in original). But the federal government had neither "plead[e]d nor present[ed] such a theory." *Id.*

The federal government filed an amended complaint, and California and the intervenors moved to dismiss for lack of standing. The district court denied the motion. Order Denying Second Motion to Dismiss, App. A-6. It reiterated that the federal government's standing theory "resting on an injury to its sovereignty" was "incognizable." App. A-4. But it held that the federal government had now pleaded "additional facts . . . raising an inference that California's enforcement of the Sales Ban frustrates the operations of the federal government." *Id.* Specifically, it noted that the complaint alleged that the Department of Agriculture had promulgated regulations under the EPIA, was "exercising its authority to enforce or administer those regulations," and that "California's enforcement of the Sales Ban plausibly encroaches on the exercise of that authority." App. A-6. It

concluded that those allegations were sufficient to provide the federal government a "cognizable constitutional injury" for Article III purposes. *Id.* But the district court *sua sponte* certified its order for interlocutory appeal under 28 U.S.C. § 1292(b), concluding that each of the three factors necessary for certification were present. App. A-10.

## REASONS WHY THE APPEAL SHOULD BE ALLOWED

Under 28 U.S.C. § 1292(b), a district court may certify an order for interlocutory appeal if it is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." This Court "may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order." *Id.*; *see Reese v. BP Expl. (Alaska), Inc.*, 643 F.3d 681, 687-688 (9th Cir. 2011) (discussing the 1292(b) factors).

This Court should permit an interlocutory appeal here. The district court correctly concluded that all three requirements necessary for such an appeal are met in this case. And the answer to the question presented will resolve an issue that is currently being litigated in cases across the country: whether the federal government can establish injury in fact for Article III purposes based on nothing more than an allegation that a state law is preempted by federal law. This theory of

"sovereign injury" is notable because it implicates the fundamental principle that a party must articulate a concrete harm—an injury *in fact*—to establish standing. The federal government's theory would create an exception to that well-established rule, allowing it—and only it—to establish standing based on an injury *in law*. No authority supports that view. *Cf. Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) (a "bare" statutory violation, "divorced from any concrete harm" does not satisfy Article III's injury in fact requirement). Accepting the federal government's standing theory would open—and indeed has opened—the courthouse door to a flood of preemption suits against a wide array of state and local laws, enmeshing the federal courts in any number of political controversies. Review of that theory is now warranted.

## I. EACH OF THE THREE FACTORS FOR INTERLOCUTORY REVIEW UNDER 28 U.S.C. § 1292(b) IS MET HERE

### A. Whether the Federal Government Has Standing Is a Controlling Question of Law

It is beyond dispute that the federal government's standing to challenge California's prohibition on the sale of eggs that come from hens confined in a cruel manner is a controlling question of law. "Whether a party has standing to pursue its claim is a question of law." *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008). And the question of standing is controlling. As this Court has explained, "all that must be shown in order for a question to be

'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation in the district court." *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982). That is the case here. If the federal government lacks standing, then this case must be dismissed. *See, e.g.*, *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). And even if this Court concludes that the federal government has sufficiently alleged standing, its guidance as to what allegations the federal government must make to establish standing—and what facts it must subsequently prove—will shape the course of future litigation, including the scope of any possible jurisdictional discovery. *See* App. A-9 (discussing this possibility). It could also reduce the number of motions to dismiss for lack of standing the district courts are called on to answer in cases like this.

### B. Reasonable Jurists Can—and Do—Differ on Whether the Federal Government Has Standing to Bring Suits Like this One

1. The district court also correctly concluded that there is a "substantial ground for difference of opinion on the standing question" presented here. App. A-8. Courts "'traditionally will find that a substantial ground for difference of opinion exists where . . . novel and difficult questions of first impression are presented,' as is the case here." *Reese*, 643 F.3d at 688 (citation omitted). And review is appropriate even if another appellate court has not "reached a conclusion adverse to that from which appellants seek relief." *Id.* "A substantial ground for difference of opinion exists where reasonable jurists might disagree on an issue's

resolution, not merely where they have already disagreed." *Id.* "Stated another way, when novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions, a novel issue may be certified for interlocutory appeal." *Id.*

That standard is met here. The "theory of constitutional standing in this matter is atypical or unprecedented." App. A-8. The federal government asserts that it has standing to challenge any state law that it alleges is preempted by federal law. In its view, the mere existence of a purportedly preempted state law impairs its "sovereign interests" in the "supremacy and execution of federal law"—even when the federal government has not alleged that that the state law is interfering with its efforts to enforce federal law or otherwise impeding its operations. D. Ct. Dkt. 90 at 1.

No case from this Court, the Supreme Court, or any court of appeals has addressed this argument. Such an unprecedented and consequential legal theory of standing more than meets the standard set forth by this Court for a substantial ground for difference of opinion. Indeed, district courts across the country, including several in this Circuit, have reached different conclusions as to whether the federal government's "sovereign injury" theory satisfies Article III's injury in fact requirement. Some have concluded that it does. *See, e.g.*, *KalshiEX LLC v. Johnson*, 832 F. Supp. 3d 954, 960 (D. Ariz. 2026) ("The federal government 'may

sue to protect its interests,' and that authority extends to suits seeking to enjoin the enforcement of preempted state law." (citation omitted)); *Cruise Lines Int'l Ass'n, Inc. v. Suganuma*, 825 F. Supp. 3d 1170, 1192 (D. Haw. 2025) (similar); *United States v. Wisconsin*, No. 26-cv-749, slip op. at 8-9 (E.D. Wis. July 28, 2026) [Dkt. 54] (similar).[8] Others have concluded that it does not. *See, e.g.*, App. A-4 (the federal government's "standing theory resting on an injury to its sovereignty" is "incognizable"); *United States v. Michigan*, No. 26-cv-00246, slip op. at 7 (W.D. Mich. Oct. 7, 2026) [Dkt. 44] ("[T]he mere existence of a conflict between the state and federal law does not itself injure [the federal government]."); *United States v. Hawaii*, 830 F. Supp. 3d 1028, 1040 (D. Haw. 2026) (similar); *cf. Nevada v. KalshiEX, LLC*, No. 26-1304, Order at 2 [Dkt. 20-1] (9th Cir. May 21, 2026) (Commodity Futures Trading Commission likely not a required party under Nevada law because it lacked a "legal interest" in Nevada's enforcement of its gaming laws against a private exchange, despite exchange's claim that Commission had exclusive jurisdiction over the matter); *Washington v. KalshiEX LLC*, No. 26-3106, Order at 2 [Dkt. 19-1] (9th Cir. May 21, 2026) (similar).

---

[8] *See also United States v. Alaska*, 608 F. Supp. 3d 802, 809 (D. Alaska 2022) (irreparable harm results from enforcement of State law that is likely preempted); *Daimler Truck N. Am. LLC v. California Air Res. Bd.*, 2025 WL 3049944, at *17 (E.D. Cal. Oct. 31, 2025) (similar with respect to the irreparable harm suffered by the federal government as intervenor).

Nor is it surprising that district courts have reached different conclusions on the question presented here. The federal government's novel "sovereign injury" theory is in significant tension with basic principles of Article III standing. The "'irreducible constitutional minimum' of standing consists of three elements." *Spokeo*, 578 U.S. at 338. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* These standing requirements apply equally to the federal government, which "must show that, like the private individual, it has such an interest in the relief sought as entitles it to move in the matter." *United States v. Mattson*, 600 F.2d 1295, 1300 (9th Cir. 1979) (quoting *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 285 (1888)).

To establish injury in fact, a plaintiff must show that he or she suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (citation omitted). For an injury to be "concrete," it must be "real, and not abstract." *Id.* at 340 (quotation marks omitted). And while Congress has a role in "identifying and elevating intangible harms," that does not mean that a bare statutory violation, "divorced from any concrete harm," satisfies the "injury-in-fact requirement of Article III." *Id.* at 341. Congress many not "simply enact an injury into existence, using its lawmaking power to transform something that is not

remotely harmful into something that is." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) (quotation marks omitted). The federal government's assertion that it is harmed by the mere existence of California's allegedly preempted law is at odds with these foundational elements of standing doctrine.

2. In the court below, the federal government argued that there is nothing "'novel'" about its theory. D. Ct. Dkt. 90 at 3. It asserted that, before this case, "no court appears to have held that the United States lacks standing to seek relief against enforcement of state law alleged to be expressly preempted by federal statute." *Id.* But, of course, the absence of controlling authority *refuting* the federal government's standing theory does not make it valid.

Nor do any of the statements from this Court, the Supreme Court, or the Eleventh Circuit that the federal government cobbled together in the court below establish that it has standing under the circumstances here. *See* D. Ct. Dkt. 90 at 4-5 (quoting or citing *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000), *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982), *Arizona v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022), *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019), *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012), and *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *rev'd in part on other grounds*, 567 U.S. 387 (2012)). None of those cases addressed whether the federal government has standing to sue a

State on the theory that the mere existence of an allegedly preempted state law constitutes Article III injury. And the Supreme Court has repeatedly warned that "drive-by jurisdictional rulings" have "no precedential effect." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998).

In any event, each of those cases is distinguishable for the reasons explained in a recent ruling from the Western District of Michigan, which dismissed on standing grounds a materially identical challenge by the federal government to Michigan's materially identical egg sales ban. For example, in *United States v. Arizona*, the federal government "asserted concrete, particularized injuries resulting from Arizona's immigration laws," including that the Arizona laws would "impose significant and counterproductive burdens on federal agencies charged with enforcing the national immigration scheme, diverting resources and attention from the dangerous aliens who [sic] the federal government targets as its top enforcement priority." *United States v. Michigan*, No. 26-cv-00246, slip op. at 6 (W.D. Mich. Oct. 7, 2026) [Dkt. 44]. No similar allegations were made here. The other cases invoked by the federal government in the court below are similarly inapposite. *See id.* at 9-11 & n.3.[9]

---

[9] The decision in *Arizona v. Yellen*, 34 F.4th 841 (9th Cir. 2022), is also inapposite. That case involved a *State's* challenge to federal funding conditions as unconstitutionally coercive. *Id.* at 847. This Court held that "States have standing when an allegedly unconstitutional funding offer is made to them," *id.* at 852, a

(continued…)

3. While the district court rejected the federal government's "sovereign injury" theory, it subsequently concluded that the federal government had sufficiently alleged that a federal executive agency (the U.S. Department of Agriculture) was "exercising its authority to enforce or administer those regulations," and that California's prohibition on the sale of eggs from hens confined in a cruel manner "plausibly encroaches on the exercise of that authority." App. A-6. In the State's view, that conclusion was plainly incorrect—but *at best* for the federal government, it is a question on which reasonable jurists can disagree. As the district court noted, the kinds of interference alleged here are significantly "more sparsely pleaded" that those alleged in cases where this Court has held that an allegedly preempted state law injures the federal government. *Id.* For example, in *United States v. King County*, 122 F.4th 740 (9th Cir. 2024), this Court held that the federal government was injured by a county ordinance that restricted airport technicians from servicing flights chartered by U.S. Immigration and Customs Enforcement. *Id.* at 750-752. It reasoned that the ordinance effectively prevented ICE from chartering flights in the County, which increased the federal government's operational costs. *Id.* at 750. It further explained that the

ruling that says nothing about the *federal government's* standing to sue a State. Moreover, this Court also held that Arizona had standing because of the risk it would be required to return accepted funds, a clear example of concrete financial harm. *Id.* at 851.

federal government faced a "substantial risk" that the county would formally prohibit the servicing of ICE flights when it implemented the order. *Id.*

Here, by contrast, allegations that California's law has depleted the Department of Agriculture's resources are "notably absent." App. A-6. Yet the district court held that it could plausibly infer that such a depletion had occurred from certain allegations in the complaint. *Id.* (citing D. Ct. Dkt. 78 at ¶¶ 64-65, 71-73, 80). The paragraphs of the complaint cited by the district court merely repeat the federal government's sovereign injury theory, quote provisions of federal law, or assert legal conclusions. *See, e.g.*, D. Ct. Dkt. 78 at ¶ 73 ("Under the Commerce Clause and the EPIA, it is the federal government's prerogative alone to establish standards of quality and condition for eggs in interstate commerce.").

As noted, *see supra* at 17, the federal government filed a challenge to Michigan's prohibition on the sale of eggs from hens confined in a cruel manner that is materially identical to this one. The federal government included the same allegations in its complaint as the one before the district court here.[10] But the court in the Michigan case dismissed the complaint because "non-conclusory allegations" as to how Michigan's enforcement of its law undermines the federal

---

[10] *Compare* D. Ct. Dkt. 78 at ¶¶ 10, 69-74, *with United States v. Michigan*, No. 26-cv-00246, First Amended Complaint at ¶¶ 5, 11, 61-65 [Dkt. No. 30] (April 27, 2026 W.D. Mich.).

government's enforcement of the EPIA were "notably absent." *United States v. Michigan*, No. 26-cv-00246, slip op. at 8 (W.D. Mich. Oct. 7, 2026) [Dkt. 44]. That disagreement among district courts addressing materially indistinguishable allegations demonstrates the need for this Court's review.

### C. Immediate Appeal Will Materially Advance the Termination of This Lawsuit

Finally, the district court properly held that an "an immediate appeal is likely to materially advance the termination of the litigation." App. A-8. This does not require that an interlocutory appeal "have a final, dispositive effect on the litigation, only that it 'may materially advance,' the litigation." *Reese*, 643 F.3d at 688 (quoting 28 U.S.C. § 1292(b)). Here, not only would an immediate appeal materially advance the litigation, it could have a dispositive effect. A ruling that the federal government lacks standing would terminate this lawsuit in full. And a ruling that it has standing would shape—and, depending on the basis for standing, potentially eliminate—any jurisdictional discovery that follows. *See* App A-9.

## II. THIS CASE PRESENTS A SIGNIFICANT QUESTION CONCERNING THE SCOPE OF THE FEDERAL GOVERNMENT'S STANDING TO SUE STATES

This Court has recognized that even if the requirements under section 1292(b) are met, it has discretion to decline to consider an interlocutory appeal. *See In re Cement Antitrust Ligit.*, 673 F.2d at 1026. It should not do so here. This case involves a significant question of law with the potential to impact not only this

case, but others both within this Circuit and across the country. That weighs strongly in favor of this Court granting permission for an interlocutory appeal here.

This case is just one among many brought by the current federal administration seeking to preempt state laws across a wide range of regulatory arenas. *See supra* at 3 & nn. 1-6. In several of these cases, the States have, as here, contended that the federal government lacks standing. *See id.* And in such cases the federal government has, as here, articulated the same novel theory of standing. *See id.* Indeed, that question is currently being litigated in several cases, many of which are pending in this Circuit. *See supra* at 3 & nn.1-4. A determination regarding the validity of the federal government's new theory of standing would meaningfully impact the wide array of cases that have sprung up across the country.

Resolving that question is also important because it implicates the "single basic idea" that animates Article III's standing requirement—"the idea of separation of powers." *TransUnion*, 594 U.S. at 422 (quotation marks omitted). "By limiting who can sue, the standing requirement implements the Framers' concept of the proper—and properly limited—role of the courts in a democratic society." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quotation marks omitted). The law of standing "means that the federal courts decide some contested legal questions later rather than sooner, thereby allowing issues to

percolate and potentially be resolved by the political branches in the democratic process." *Id.*

The federal government's expansive theory of standing turns these precepts on their head. If accepted, the federal government's "sovereign injury" theory would entangle federal courts in a wide range of political disputes between separate sovereigns based on nothing more than a bare allegation that a state law is preempted by a federal one—an asserted injury in law, not an injury in fact. And it would greenlight a "campaign of preemption suits under the aegis of the [federal government's] sovereignty to bring state laws in line with its own political agenda." App. B-9. As the district court concluded, the "potential for abuse of the federal courts for political purposes is manifest." *Id.*

There is no need, moreover, to run this risk of abuse and political entanglement, because there are ample private parties with standing to raise appropriate preemption challenges. Indeed, that is how preemption suits typically arise: a private party subject to state restrictions challenges the restrictions as preempted. *See, e.g.*, *National Meat Ass'n v. Harris*, 565 U.S. 452 (2012). The fact that no egg farmers or other businesses affected by the sales ban challenged here have opted to bring such suits merely shows that there is no real-world controversy that demands involvement of the judiciary. And if the federal government can sue on preemption grounds based on a bare "sovereign" injury,

there would be nothing stopping it from suing on *any* federal constitutional ground, without pointing to the type of concrete injury normally required for standing purposes. Members of the Supreme Court have raised serious doubts about that expansive "sovereign" theory of standing. *See, e.g.*, Tr. of Oral Argument at 5:7-9:8, 29:22-30:4, 44:4-45:8, 45:14-46:7, *United States v. Texas*, 142 S. Ct. 416 (Mem.) (2021) (No. 21-588); *see also* Br. for Respondents at 34-38, *United States v. Texas*, 142 S. Ct. 416 (Mem.) (2021) (No. 21-588) ( "[p]urported 'sovereign interests' do not give the United States standing" to challenge a state law allegedly in conflict with the Constitution).

///

///

///

## CONCLUSION

The petition to seek an interlocutory appeal under 28 U.S.C. § 1292(b) should be granted.

Dated: October 12, 2026

Respectfully submitted,

*s/ Kristin Liska*

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
SAMUEL P. SIEGEL
*Supervising Deputy Solicitor General*
ANYA M. BINSACCA
*Supervising Deputy Attorney General*
KRISTEN C.A. KIDO
KRISTIN A. LISKA
*Deputy Attorneys General*

## STATEMENT OF RELATED CASES

The State is not aware of any related cases, as defined by Ninth Circuit Rule 28-2.6, that are currently pending in this Court and are not already consolidated here.

## CERTIFICATE OF COMPLIANCE

I am the attorney for Defendants-Petitioners in this matter. I certify that this brief has been prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and contains 5,582 words. This complies with the word limit of 5,600 words, set by Circuit Rule 5-2 converted using Circuit Rule 32-3.

Dated: October 12, 2026

*s/ Kristin Liska*
Kristin A. Liska

# APPENDIX TO
# PETITION FOR PERMISSION TO APPEAL
# PURSUANT TO 28 U.S.C. § 1292(b)

# TABLE OF CONTENTS

**Page**

Order Denying Second Motion to Dismiss,
C.D. Cal. Docket No. 103 (filed October 2, 2026)................................App. A-1

Order Granting First Motion to Dismiss,
C.D. Cal. Docket No. 77 (filed March 18, 2026) .................................App. B-1

**JS-6**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF CALIFORNIA et al.,<br><br>Defendants. | Case No. 2:25-cv-06230-MCS-CTS<br><br>**ORDER DENYING MOTION TO DISMISS, CERTIFYING ORDER FOR INTERLOCUTORY APPEAL, AND STAYING ACTION (ECF NOS. 87, 89)** |

## I. INTRODUCTION

In this preemption suit, the Court dismissed the amended complaint on the basis that Plaintiff United States of America did not plead enough facts to support its constitutional standing. (Order 10, ECF No. 77.) Plaintiff filed a second amended complaint. (SAC, ECF No. 78.) Defendants—the State of California; Gavin C. Newsom, in his official capacity as Governor of California; Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture; Erica Pan, in her official capacity as Director of the California Department of Public Health; and Rob Bonta, in his official capacity as Attorney General of California—and Defendant-Intervenors—Humane World for Animals; Animal Legal Defense Fund; Animal Equality; The Humane League; Farm Sanctuary; Compassion in World Farming, Inc.; Animal Outlook; Association of California Egg Farmers; Animal Wellness Action; and Center for a Humane Economy—filed a motion to dismiss. (Mot., ECF No. 89.)[1] The motion is fully briefed. (Opp'n, ECF No. 90; Reply, ECF No. 91.) The Court heard oral argument on July 6, 2026. (Mins., ECF No. 97.)

## II. BACKGROUND

The Court incorporates by reference its summary of the dispute from its order dismissing the amended complaint. (Order 3.) In brief, Plaintiff contends that the federal Egg Products Inspection Act ("EPIA") preempts certain California statutory provisions, and regulations promulgated thereunder, that prohibit the sale of eggs laid by hens confined under certain "cruel" conditions, which Plaintiff refers to as a "Sales Ban."[2] (SAC ¶ 47 n.7; *see generally id.* ¶¶ 20–57.) Plaintiff seeks a declaration that the EPIA

---

[1] The originally filed version of the motion contained non-substantive errors. (Notice of Errata, ECF No. 88.) The Court refers to the corrected motion in this Order and directs the Clerk to terminate the original motion.

[2] For ease of reference only, the Court uses Plaintiff's term in this Order.

preempts the Sales Ban, and an injunction precluding California from enforcing the Sales Ban. (*Id.*, Prayer for Relief.)

According to its operative pleading, Plaintiff has constitutional standing to pursue this action "to vindicate its sovereign interests," which "include ensuring that State laws do not interfere with federal law, or with the federal government's exclusive authority over interstate commerce." (SAC ¶ 10.) In enacting the EPIA, which preempts state laws that add to or differ from federal standards, Congress intended to mandate nationally uniform egg standards. (*Id.* ¶¶ 62–65.) In furtherance of this intent, Congress enabled the Secretary of Agriculture to promulgate federal standards for shell eggs as well as the labeling and packaging of egg products, which authority the Department of Agriculture exercised. (*Id.* ¶¶ 24, 27, 64, 80.) California's enforcement of the Sales Ban, which departs from those federal standards, thus usurps the federal government's exclusive authority over interstate commerce and derivative interest in nationally uniform egg standards. (*Id.* ¶ 73; *see id.* ¶¶ 69–73.)

## III. MOTION TO DISMISS

### A. Legal Standard

Federal Rule of Civil Procedure 12(b)(1) authorizes a party to seek dismissal of an action for lack of standing. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121 (9th Cir. 2010). In the context of a Rule 12(b)(1) motion, the plaintiff bears the burden of establishing Article III standing to assert its claims. *Id.* at 1122.

When a motion to dismiss attacks subject-matter jurisdiction on the face of the complaint, a court must assume the factual allegations in the complaint are true and draw all reasonable inferences in the plaintiff's favor. *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009). Moreover, the standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), apply with equal force to Article III standing challenged on the face of the complaint. *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012) (applying *Iqbal*). In

other words, the complaint must clearly allege each element of standing with "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1092 (9th Cir. 2020).

**B. Discussion**

The parties dispute whether Plaintiff's new pleading satisfies one of the foundational elements of constitutional standing: injury in fact. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025).[3] In dismissing the previous version of the complaint, the Court reasoned that Plaintiff had not pleaded a standing theory resting on an injury to its sovereignty, and that the theory it proffered in its brief was incognizable. (Order at 5–9.) Citing *United States v. King County*, 122 F.4th 740, 751 (9th Cir. 2024), and *United States v. Mattson*, 600 F.2d 1295, 1298–99 (9th Cir. 1979), the Court left open the possibility that California's enforcement of the Sales Ban "could give rise to an injury in fact by impeding the operations or functions of the federal government." (Order 7.)

Plaintiff pleads additional facts in its second amended complaint raising an inference that California's enforcement of the Sales Ban frustrates the operations of the federal government by undermining federal regulations that vindicate the congressional interest in nationally uniform egg standards. (SAC ¶¶ 64–65, 70–73.) Plaintiff's allegations of fact and the framework of federal law are closely entangled on this issue. As Plaintiff's counsel argued at the hearing, the Court must accept the statutory statement of congressional intent in enacting the EPIA as Plaintiff construes it for the purposes of the standing analysis. (*See* Tr. 11–12, ECF No. 100); *see also* 21 U.S.C. § 1031 ("[R]egulation by the Secretary of Agriculture and the Secretary of Health and

---

[3] The Court incorporates by reference its recitation of the standards governing constitutional standing from its prior order. (Order 5.)

Human Services, and cooperation by the States and other jurisdictions, . . . are appropriate to prevent and eliminate burdens upon [interstate or foreign] commerce, to effectively regulate such commerce, and to protect the health and welfare of consumers."); *id.* § 1032 ("It is hereby declared to be the policy of the Congress to provide for . . . uniformity of standards for eggs . . . ."). So considered, Plaintiff raises a plausible inference that the Sales Ban undermines the regulatory scheme designed to fulfill that intent. And that, in turn, raises a plausible inference that the Sales Ban interferes with Department of Agriculture operations to enforce those regulations or otherwise to engage with the market for eggs in exercise of its regulatory power. *See, e.g.*, 7 C.F.R. § 57.10 ("The Administrator [of the Agricultural Marketing Service] shall perform . . . such duties as the Secretary [of Agriculture] may require in the enforcement or administration of the provisions of the [EPIA] and the regulations in this part.").

On the pleadings, these inferences sufficiently support Plaintiff's standing. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982) (recognizing a sovereign may assert an injury to a sovereign interest, such as its "exercise of sovereign power," including "the power to create and enforce a legal code"); *Arizona v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022) (noting a sovereign may "allege[] sufficiently concrete and particularized harms to its ability to exercise its sovereign prerogatives, intangible as those prerogatives may be"); *Mattson*, 600 F.2d at 1298 (noting sovereign suits brought "to relieve a burden on interstate commerce caused by the violation of some congressional enactment"). *King County* is instructive. There, a circuit panel concluded that the United States had constitutional standing to challenge a county order restricting fixed base operators at an airport from servicing Immigration and Customs Enforcement charter flights. 122 F.4th at 750–52. The panel reasoned that the county order prevented the agency from accessing services at the airport, effectively precluding the agency from chartering flights there and increasing operational costs to the United States. *Id.* at 750. The United States also faced a "substantial risk" that the

county would formally prohibit servicing of federal charter flights in its implementation of the order. *Id.* at 751. There, as here, nonfederal government action allegedly interfered with the operations of a federal executive agency, providing the United States a cognizable constitutional injury to challenge that action.

Granted, the interference alleged here is more sparsely pleaded than what the United States asserted in *King County*. Notably, unlike in that case, here Plaintiff is not the target of the nonfederal government action, so "standing is . . . substantially more difficult to establish." *United States v. City of Arcata*, 629 F.3d 986, 989 (9th Cir. 2010) (internal quotation marks omitted). The injury recognized here relies on an inference that the Department of Agriculture is exercising the authority Congress gave it to implement the EPIA in the market for eggs, which flows from its promulgation of egg product standards. (*See* SAC ¶¶ 64, 80.) Specific allegations toward the depletion of resources the Sales Ban causes the Agricultural Marketing Service, Department of Agriculture inspectors, or some other executive agency or actor are notably absent. But the complaint supports an inference that the Department of Agriculture not only has exercised its authority to promulgate regulations, but also is exercising its authority to enforce or administer those regulations. (*E.g.*, SAC ¶¶ 64, 71–73.) And, accepting Plaintiff's legal theory as valid for the purposes of the standing analysis, *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 298 (2022), California's enforcement of the Sales Ban plausibly encroaches on the exercise of that authority. (*See* SAC ¶¶ 51–58, 63–65, 69–73). This is enough to survive a facial challenge to Plaintiff's pleading. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . .").

The motion is denied.

///

# IV. CERTIFICATION

## A. Legal Standard

Generally, appellate review of district court rulings must wait until after a final judgment. 28 U.S.C. § 1291 (conferring "jurisdiction of appeals from all final decisions of the district courts"); *Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738, 747 (9th Cir. 2008) ("A district court order is . . . not appealable unless it disposes of all claims as to all parties or unless judgment is entered in compliance with Federal Rule of Civil Procedure 54(b)."). However, a district judge who issues "an order not otherwise appealable" may certify the order for appeal if the judge is "of the opinion that such order [(1)] involves a controlling question of law [(2)] as to which there is substantial ground for difference of opinion and [(3)] that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "Certification under § 1292(b) requires the district court to expressly find in writing that all three § 1292(b) requirements are met." *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010). "Section 1292(b) is a departure from the normal rule that only final judgments are appealable, and therefore must be construed narrowly." *James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1067 n.6 (9th Cir. 2002).

"Although . . . an interlocutory appeal does not automatically stay proceedings in the district court, the district court has broad discretion to decide whether a stay is appropriate to 'promote economy of time and effort for itself, for counsel, and for litigants.'" *Ass'n of Irritated Residents v. Fred Schakel Dairy*, 634 F. Supp. 2d 1081, 1094 (E.D. Cal. 2008) (quoting *Filtrol Corp. v. Kelleher*, 467 F.2d 242, 244 (9th Cir. 1972)). "In such cases the court may order a stay of the action pursuant to its power to control its docket and calendar and to provide for a just determination of the cases pending before it." *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 864 (9th Cir. 1979).

///

**B. Discussion**

The Court certifies this Order for interlocutory appeal because the threshold question of Plaintiff's standing is a challenging one likely to drive further proceedings in the case. Constitutional standing is a jurisdictional issue that generally must be resolved before any adjudication of the merits. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999). Whether Plaintiff alleges a cognizable theory of standing is a dispositive legal question suitable for disposition in the Court of Appeals before proceedings continue in this Court. *See In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982) ("[A]ll that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation in the district court.").

There is substantial ground for difference of opinion on the standing question. Counsel on both sides recognized that Plaintiff's theory of constitutional standing in this matter is atypical or unprecedented. (Tr. 14, 18.) The Court of Appeals might conclude that the Court overstretched inferences that reasonably can be extracted from Plaintiff's pleading of the Department of Agriculture's exercise of regulatory authority. Or the appellate court may endorse a different theory of standing Plaintiff offers. (*E.g.*, Opp'n 4–5 (arguing a violation of federal law inflicts an injury to federal sovereignty); *id.* at 7 (contending Congress's authorization of EPIA enforcement actions supports standing)); *see Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996) ("[T]he appellate court may address any issue fairly included within the certified order because it is the order that is appealable, and not the controlling question identified by the district court."). Review is likely to provide clarity on abstruse sovereign standing issues on which reasonable jurists could disagree. *See Couch*, 611 F.3d at 633 ("[A] substantial ground for difference of opinion exists where . . . novel and difficult questions of first impression are presented." (internal quotation marks omitted)).

Finally, an immediate appeal is likely to materially advance the termination of the litigation. Although the parties suggested at a prior hearing that they do not need to

take merits discovery in this action, (*see* Order 11 (memorializing discussion)), Defendants and Defendant-Intervenors should be given an opportunity to explore the standing theory credited here through jurisdictional discovery. At the most recent hearing, Defendants' counsel stated that Defendant intended to take discovery into "the factual matters of the interference with federal operations." (Tr. 22.) And counsel for Defendant-Intervenor Association of California Egg Farmers speculated that Department of Agriculture inspectors' testimony regarding their application of federal grading standards might support Plaintiff's theory of standing. (*Id.* at 31–32.) The parties should gather additional information about the impact of the Sales Ban on executive enforcement and administration of the EPIA, especially given the paucity of pleaded facts relevant to the issue. If this Order is reversed on appeal, the parties may avoid expending significant time and resources toward discovery on this theory of standing. Alternatively, the parties may be able to avoid discovery if the Court of Appeals credits a different standing theory. Accordingly, resolution of the threshold standing question on appeal "may appreciably shorten the time, effort, or expense of conducting the district court proceedings." *ICTSI Or., Inc. v. Int'l Longshore & Warehouse Union*, 22 F.4th 1125, 1131 (9th Cir. 2022) (internal quotation marks omitted).

For similar reasons, the Court exercises its discretion to stay proceedings pending the anticipated interlocutory appeal. The circuit court ultimately could render a decision that would make jurisdictional discovery unnecessary. Proceeding immediately to the jurisdictional discovery phase while an interlocutory appeal is pending may waste substantial court and party resources.

///

## V. CONCLUSION

The Court denies the motion to dismiss and certifies this Order for interlocutory appeal. The Court stays the action until the expiration of Defendants' deadline to appeal this Order or the conclusion of any appeal of this Order, whichever is later. For case administration purposes only, the Court directs the Clerk to remove the action from the Court's active caseload until further application by the parties or order of this Court. The parties shall file a joint status report within 120 days, and a further report every 120 days thereafter. Each report must state on the cover page the date the next report is due. Additionally, the parties must notify the Court within seven days of the expiration of Defendants' deadline to appeal or the conclusion of the appeal, whichever is applicable.

**IT IS SO ORDERED.**

Dated: October 2, 2026

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF CALIFORNIA et al.,<br><br>Defendants. | Case No. 2:25-cv-06230-MCS-AGR<br><br>**ORDER RE: MOTIONS TO DISMISS AND MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 58–61, 67)** |

## I. INTRODUCTION

Seeking to enforce the pecking order between federal and state laws, the United States of America brings this action for declaratory and injunctive relief against the State of California and its officers arguing that the federal Egg Products Inspection Act ("EPIA") preempts California laws and regulations governing the sale and shipment of eggs produced by hens confined in certain conditions. (*See generally* FAC, ECF No. 47.) The Court previously authorized a clutch of intervenors to participate in the case. (Order Gr. Mots. to Intervene, ECF No. 56.)

Now pending before the Court are five motions: (1) a motion to dismiss by Defendant-Intervenors Center for a Humane Economy and Animal Wellness Action, (CHE Mot., ECF No. 58-1); (2) a motion to dismiss by Defendant-Intervenors Humane World for Animals, Animal Legal Defense Fund, Animal Equality, The Humane League, Farm Sanctuary, Compassion in World Farming, Inc., and Animal Outlook, (HWA Mot., ECF No. 59-1); (3) a motion to dismiss by Defendants the State of California; Gavin C. Newsom, in his official capacity as Governor of California; Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture; Erica Pan, in her official capacity as Director of the California Department of Public Health; and Rob Bonta, in his official capacity as Attorney General of California, (CA Mot., ECF No. 60); (4) a motion for summary judgment by Defendant-Intervenor Association of California Egg Farmers, (ACEF Mot., ECF No. 61-1); and (5) a motion for summary judgment by Plaintiff United States of America, (USA Mot., ECF No. 67-1). The motions are fully briefed. (CHE Reply, ECF No. 70; HWA Reply, ECF No. 72; CA Reply, ECF No. 73; ACEF Reply, ECF No. 71; USA Reply, ECF No. 74.) The Court heard oral argument on February 23, 2026. (Mins., ECF No. 75.)

For the following reasons, the Court grants the motions to dismiss the complaint based on Plaintiff's failure to allege facts supporting a cognizable theory of standing. The Court reaches no other issues presented in the motions and grants Plaintiff leave to amend.

## II. BACKGROUND

In 1970, Congress passed the EPIA to protect the health and welfare of consumers with respect to eggs and egg products. 21 U.S.C. § 1031. The EPIA provides that, "[f]or eggs which have moved or are moving in interstate or foreign commerce, . . . no State or local jurisdiction may require the use of standards of quality, condition, weight, quantity, or grade which are in addition to or different from the official Federal standards" set forth in the EPIA. *Id.* § 1052(b). The United States contends that California Health and Safety Code sections 25990(b)(3)–(4) and 25996, and 3 California Code of Regulations sections 1320.1 and .4, laws and regulations that prohibit the sale of eggs from hens confined under certain "cruel" conditions, run a-fowl of this preemption provision. (*See generally* FAC ¶¶ 27–52, 59, 63, 66.)

According to the United States, California's laws and regulations "ha[ve] contributed to the historic rise in egg prices" and "have diminished the purchasing power and prosperity of the American worker." (*Id.* ¶¶ 1–2; *see also id.* ¶¶ 5, 8.) The United States asserts that "it is the prerogative of the federal government alone to regulate the quality, inspection, and packaging of eggs," and that "the Supremacy Clause does not permit California to inflate egg prices by imposing additional standards that regulate the quality of eggs." (*Id.* ¶¶ 6–7.) On this basis, the federal government seeks a declaration that the California laws and regulations at issue are preempted by the EPIA, and an injunction precluding California from enforcing these laws and regulations. (*Id.*, Prayer for Relief.)

## III. LEGAL STANDARD

The standard governing motions to dismiss raising facial challenges to constitutional standing rules the roost here. Federal Rule of Civil Procedure 12(b)(1) authorizes a party to seek dismissal of an action for lack of standing. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121 (9th Cir. 2010). In the context of a Rule

12(b)(1) motion, the plaintiff bears the burden of establishing Article III standing to assert the claims. *Id.* at 1122.

When a motion to dismiss attacks subject-matter jurisdiction on the face of the complaint, a court must assume the factual allegations in the complaint are true and draw all reasonable inferences in the plaintiff's favor. *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009). Moreover, the standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), apply with equal force to Article III standing challenged on the face of the complaint. *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012) (applying *Iqbal*). In other words, the complaint must clearly allege each element of standing with "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1092 (9th Cir. 2020).

## IV. DISCUSSION

Three of Defendants and Defendant-Intervenors' motions challenge Plaintiff's constitutional standing to maintain this lawsuit. (CA Mot. 11–13; ACEF Mot. 9–10; HWA Mot. 11.)[1] And unlike with the chickens and eggs at issue here, there is no question that an analysis of standing must come first. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999) ("[J]urisdiction generally must precede merits in dispositional order[.]"); *Carijano v. Occidental Petrol. Corp.*, 643 F.3d 1216, 1227 (9th Cir. 2011) ("Article III standing is a species of subject matter jurisdiction.").

---

[1] Association of California Egg Farmers moves for summary judgment on the standing issue, noting that "the United States has submitted no evidence of any kind showing injury arising from the challenged California laws." (ACEF Reply 2.) Because the standing problem here may be an issue of pleading and not of proof, the Court does not resolve the Association's motion but has considered its standing arguments.

"Under Article III of the Constitution, a plaintiff needs a 'personal stake' in the case." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). "Standing . . . 'tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)). "[F]ederal courts do not issue advisory opinions about the law—even when requested by the President." *Id.* at 378–79. This principle extends to the federal government at large, which similarly must establish its standing to bring a civil suit in federal court. *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 285 (1888). Because the United States "is not the target of the challenged government action," as it does not allege it is a participant in the egg marketplace to which the subject California laws and regulations apply, the federal government's ability to bring suit is "'substantially more difficult to establish.'" *United States v. City of Arcata*, 629 F.3d 986, 989 (9th Cir. 2010) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).

"'[T]he irreducible constitutional minimum of standing contains three elements': injury in fact, causation, and redressability." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025) (quoting *Lujan*, 504 U.S. at 560). The United States fails to plead facts toward any of the elements. In its briefs, the federal government asserts that it "is suffering an ongoing injury to its sovereignty because the Sales Ban and Labeling Requirements violate the EPIA and are expressly preempted." (USA Mot. 9.) Questioned at the hearing about where the United States articulated its sovereign injury theory in the complaint, counsel merely pointed to allegations that the EPIA preempts the California laws and regulations at issue. (FAC ¶¶ 59, 63, 66.) Not only are these allegations undisguised legal conclusions in search of substantiating facts, but they also raise no inferences about the sovereign injury asserted in Plaintiff's briefing, depriving

Defendants and Defendant-Intervenors of adequate notice of the federal government's standing theory. *See* Fed. R. Civ. P. 8(a)(1). As an illustrative contrast, Plaintiff offers numerous allegations that the subject laws and regulations harm working-class Americans by effectively inflating egg prices, (FAC ¶¶ 1–2, 5, 8),[2] but nowhere in the complaint does Plaintiff provide any facts raising an inference that California's laws and regulations diminish the sovereignty of the federal government.

Plaintiff comes closest to articulating its sovereign injury theory in alleging that Congress exercised its authority under the Supremacy Clause to enact a preemption provision in the EPIA, and that California nonetheless maintains allegedly preempted laws and regulations. (*Id.* ¶ 7.) But Plaintiff presents no binding authority holding that the mere *existence* of a preempted state law creates a sovereign injury to the federal government.[3] Instead, the Supreme Court has "long recognized that state laws that conflict with federal law are without effect." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (internal quotation marks omitted). From this principle flows the proposition that, if Plaintiff's preemption theory is correct, the existence of California's laws and regulations governing egg sales and distribution in and of themselves do not harm

---

[2] This, of course, does not satisfy the injury-in-fact requirement. *Carney v. Adams*, 592 U.S. 53, 59 (2020) ("[A] plaintiff cannot establish standing by asserting an abstract general interest common to all members of the public, no matter how sincere or deeply committed a plaintiff is to vindicating that general interest on behalf of the public." (internal quotation marks and citations omitted)).

[3] To be sure, there are any number of state laws currently on the books that conflict with the United States Constitution and federal law as interpreted by the Supreme Court. *Compare, e.g.*, D.C. Code § 22-4506(a) (authorizing police chief to issue a concealed-carry license "if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol"), *with N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 15, 71 (2022) (deeming unconstitutional New York's proper-cause requirement for concealed-carry license, of which the District of Columbia's requirement is an analogue), *and* Tex. Fam. Code Ann. § 2.001(b) ("A [marriage] license may not be issued for the marriage of persons of the same sex."), *with Obergefell v. Hodges*, 576 U.S. 644, 681 (2015) ("[S]ame-sex couples may exercise the fundamental right to marry in all States.").

Plaintiff because they are illusory. Perhaps California's *enforcement* of the subject laws and regulations could give rise to an injury in fact by impeding the operations or functions of the federal government, but Plaintiff neither pleads nor presents such a theory. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." (internal quotation marks omitted)); *cf., e.g.*, *United States v. King County*, 122 F.4th 740, 751 (9th Cir. 2024) (finding the United States demonstrated injury in fact where there was a "substantial risk that the County will formally prohibit Boeing Field [fixed base operators] from servicing [Immigration and Customs Enforcement] charter flights"); *United States v. Mattson*, 600 F.2d 1295, 1298–99 (9th Cir. 1979) (observing that "there has been no assertion of a property interest, interference with national security or a burden on interstate commerce" in concluding the United States had not demonstrated standing).

In any event, Plaintiff's understanding that California "violate[d]" the EPIA and the Supremacy Clause by enacting and promulgating the subject laws and regulations, (FAC ¶¶ 59, 63, 66), "is a mistake," *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 478 (2018). The Supreme Court teaches that preemption provisions like 21 U.S.C. § 1052(b) "might appear to operate directly on the States" based on their phrasing, but they instead should be read to "confer[] on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.* at 478–79 (construing a preemption provision of the Airline Deregulation Act of 1978 that provided that "no State . . . shall enact or enforce any law . . . relating to rates, routes, or services of any [covered] air carrier" (alteration in original) (internal quotation marks omitted)). This is because preemption principles derived from the Supremacy Clause "provide[] a rule of decision," not "an independent grant of legislative power to Congress." *Id.* at 477 (internal quotation marks omitted). "[S]ince the Constitution confers upon Congress the power to regulate individuals, not States, the [preemption] provision at issue must be best read as one that regulates private actors." *Id.* (internal

quotation marks and citation omitted). Thus, authorities providing that the United States may assert an "injury to its sovereignty arising from violation of its laws," *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000), are inapposite, as, under *Murphy*, the preemption provision the United States invokes is neither directed to nor violable by any State, and the Supremacy Clause does not itself conjure a substantive right that Congress or the United States may vindicate through suit. *See Mattson*, 600 F.2d at 1300 ("[T]hese [standing] requirements cannot be evaded by an assertion of nonstatutory authority.").[4]

Rejecting Plaintiff's sovereign injury theory aligns with sound jurisprudence. Suppose the United States suffered a constitutional injury any time federal law preempts state law. Should the United States be permitted—or perhaps even *required*—to participate in a civil suit between private parties every time a defendant moves to dismiss a claim based on federal preemption? *See* Fed. Rs. Civ. P. 19(a), 24(a)–(b). Surely the limited resources of the United States Attorney's Office would be better expended prosecuting violations of federal criminal laws and protecting federal civil

---

[4] At oral argument and in its reply brief, counsel compared the sovereign injury theory Plaintiff advances here to the sovereign injury that undergirds any federal criminal prosecution. (*See* USA Reply 2); *see also Vt. Agency of Nat Res.*, 529 U.S. at 771 (noting in dicta that "the injury to [the United States'] sovereignty arising from violation of its laws . . . suffices to support a criminal lawsuit by the Government"). The United States' standing to prosecute criminal cases hardly provides a persuasive analogy, as legal scholars long have puzzled over the application of standing doctrine to criminal cases. *See, e.g.*, F. Andrew Hessick & Sarah A. Benecky, *Standing and Criminal Law*, 49 BYU L. Rev. 961, 976 (2024) ("The Court has never seriously grappled with how the United States satisfies Article III's concrete and particularized injury requirement when it brings a criminal prosecution. . . . [I]t is difficult to see how violations of sovereignty are sufficiently concrete to support standing."); Edward A. Hartnett, *The Standing of the United States: How Criminal Prosecutions Show that Standing Doctrine Is Looking for Answers in All the Wrong Places*, 97 Mich. L. Rev. 2239, 2248 (1999) ("[I]f current standing doctrine is correct, then the vast majority of federal criminal prosecutions are not 'cases' or 'controversies' and the United States lacks standing to initiate them.").

rights than, say, weighing in on whether federal law preempts state law false advertising claims concerning toothpaste packaging. *E.g.*, *Cross v. Haleon US, Inc.*, No. 2:24-cv-09325-MCS-PVC, 2025 U.S. Dist. LEXIS 138175, at *4–8 (C.D. Cal. July 11, 2025) (Scarsi, J.). Further, suppose the executive or the decisionmakers at the Department of Justice simply do not like a state law because it is in tension with their policies. Without requiring the United States to show some redressable injury, the federal government might initiate a campaign of preemption suits under the aegis of its sovereignty to bring state laws in line with its own political agenda. The potential for abuse of the federal courts for political purposes is manifest. Standing doctrine provides a valuable safeguard. *See All. for Hippocratic Med.*, 602 U.S. at 380 ("By limiting who can sue, the standing requirement implements the Framers' concept of the proper—and properly limited—role of the courts in a democratic society. . . . And the standing requirement means that the federal courts may never need to decide some contested legal questions: Our system of government leaves many crucial decisions to the political processes, where democratic debate can occur and a wide variety of interests and views can be weighed." (internal quotation marks omitted)).

Plaintiff has not pleaded facts showing it has standing to maintain this lawsuit, and the theory of standing it asserts in its briefing is incognizable. The motions to dismiss are granted insofar as the movants assert Plaintiff fails to allege facts demonstrating its constitutional standing. Because this is a threshold defect that alone demands dismissal of the first amended complaint, the Court does not reach any other issue presented in the motions. Although Plaintiff put all its eggs in the sovereign-injury theory of standing, other standing theories may be articulable on repleading. Given the Ninth Circuit policy of granting leave to amend "with extreme liberality," *Jensen v. Brown*, 131 F.4th 677, 701 (9th Cir. 2025) (internal quotation marks omitted), the Court grants Plaintiff leave to amend.

///

## V. CONCLUSION

The Court dismisses the complaint for want of standing. Plaintiff may file a further amended complaint within 14 days of entry of this Order provided that it can do so in accordance with Federal Rule of Civil Procedure 11(b) and this Order. Plaintiff's amended complaint must be accompanied by a redline version tracking all changes. (Initial Standing Order § 10(a), ECF No. 13.) Leave to add new parties or claims must be sought by a separate, properly noticed motion. Failure to file a timely amended complaint—or a notice that Plaintiff stands by the dismissed complaint and consents to entry of an appealable judgment—will result in dismissal for lack of prosecution without further warning.

The Court suspends Defendants and Defendant-Intervenors' obligation to respond to any amended complaint. Instead, within 14 days of the filing of an amended complaint, the parties shall confer and file a joint statement (1) indicating whether Defendants or Defendant-Intervenors intend to challenge the amended complaint on the basis of standing or any ground not presented in the motions previously filed and (2) if so, proposing a schedule for motion practice—and discovery, if appropriate.

///

The parties thoroughly briefed the issues that the Court did not reach in this Order, and the parties suggested at the hearing that they do not need merits discovery. In the interest of conserving party and court resources, absent a further order of the Court upon a stipulation or motion by the parties, the Court will not take further briefing on those issues. Should Defendants and Defendant-Intervenors elect not to challenge the amended complaint on the basis of standing or a new ground, or should the Court reject such challenges to the amended complaint, the Court will administratively reopen the motions addressed in this Order and evaluate the parties' positions presented therein.

**IT IS SO ORDERED.**

Dated: March 18, 2026

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

# CERTIFICATE OF SERVICE BY E-MAIL AND U.S. MAIL

Case Name: ***United States of America v. The State of California, et al.***
Case No.:

I, Vanessa Jordan, hereby certify: I am employed by the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am over the age of 18 years and not a party to this matter. My business address is: 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004. My electronic service address is Vanessa.Jordan@doj.ca.gov.

On October 12, 2026, I served the attached:

**"Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b)" (with Appendix: App. A-1 to A-10; App. B-1 to B11)**

by transmitting a true copy thereof via electronic mail to the e-mail addresses listed on the attached "Service List." In addition, I placed a true copy thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail at San Francisco, California, addressed to all counsel on the attached "Service List."

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on October 12, 2026, at San Francisco, California.

| | |
|---|---|
| Vanessa Jordan | Vanessa Jordan |
| Declarant | Signature |

# SERVICE LIST

| |
|---|
| **Joseph William Tursi**<br>U.S. ATTORNEYS OFFICE<br>Central District of California<br>300 North Los Angeles Street, Suite 7516<br>Los Angeles, CA 90012<br>**E-mail: Joseph.Tursi@usdoj.Gov**<br>*Attorney for Plaintiff-Respondent United States of America* |
| **Alexander K. Haas** (*via U.S. Mail only*)<br>**John Bailey**<br>U.S. DEPARTMENT OF JUSTICE<br>950 Constitution Avenue, NW<br>Washington, DC 20005<br>**E-mail: John.Bailey@usdoj.Gov**<br>*Attorneys for Plaintiff-Respondent United States of America* |
| **Bruce Andrew Wagman**<br>RILEY SAFER HOLMES AND CANCILA LLP<br>100 Spectrum Center Drive, Suite 440<br>Irvine, CA 92618<br>**E-mail: Bwagman@rshc-Law.Com**<br>*Attorney for Intervenor-Defendants Humane World for Animals; Animal Legal Defense Fund; Animal Equality; The Humane League; Farm Sanctuary; Compassion in World Farming, Inc.; Animal Outlook* |
| **Brian M. Boynton**<br>**Thomas G. Saunders**<br>WILMER CUTLER PICKERING HALE AND DORR LLP<br>2100 Pennsylvania Avenue, NW<br>Washington, DC 20037<br>**E-mail: Brian.Boynton@wilmerhale.Com**<br>**E-mail: Thomas.Saunders@wilmerhale.Com**<br>*Attorneys for Intervenor-Defendant Association of California Egg Farmers* |

## SERVICE LIST (Continued)

| |
|---|
| **Leah M. Fugere**<br>WILMER CUTLER PICKERING HALE AND DORR LLP<br>350 South Grand Avenue, Suite 2400<br>Los Angeles, CA 90071<br>**E-mail: Leah.Fugere@wilmerhale.Com**<br>*Attorney for Intervenor-Defendant Association of California Egg Farmers* |
| **Jessica L. Blome**<br>GREENFIRE LAW, PC<br>2748 Adeline Street, Suite A<br>Berkeley, CA 94703<br>**E-mail: Jblome@greenfirelaw.Com**<br>*Attorney for Intervenor-Defendants The Center for a Humane Economy, and Animal Wellness Action* |
| **Grace Claire Suzanne**<br>GREENFIRE LAW, PC<br>2748 Adeline Street, Suite A<br>Berkeley, CA 94703<br>**E-mail: Gwainscoat@greenfirelaw.Com**<br>*Attorney for Intervenor-Defendant Animal Wellness Action* |